```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
                  v.                        15 Cr. 727 (JSR)
 4
     LILIAN JAKACKI,
 5   MARCIN JAKACKI,
     M&W GLOBAL ENTERPRISES, INC.,
 6   EUROPEAN APOTHECARY,
     ROBERT CYBULSKI,
 7
                      Defendants.
 8
     ------------------------------x
 9
                                        New York, N.Y.
10                                      November 3, 2015
                                        4:35 p.m.
11
     Before:
12
                      HON. JED S. RAKOFF,
13
                                        District Judge
14

15                      APPEARANCES

16   PREET BHARARA
          United States Attorney for the
17        Southern District of New York
     LOUIS PELLEGRINO
18   ANDREW BEATY
          Assistant United States Attorneys
19
     FEDERAL DEFENDERS OF NEW YORK
20        Attorneys for Defendant Lilian Jakacki
     CHRISTOPHER FLOOD
21
     DOAR RIECK KALEY & MACK
22        Attorneys for Defendant Marcin Jakacki
     JOHN KALEY
23
     LOUIS GRANDELLI
24        Attorney for Defendant Robert Cybulski
     JOHN RAPAWY
25
```

1          (Case called)

2          MR. PELLEGRINO:  Good afternoon, your Honor, Louis

3    Pellegrino from the U.S. Attorney's Office with AUSA Andrew

4    Beaty.

5          MR. RAPAWY:  Good afternoon, your Honor, appearing for

6    Mr. Robert Cybulski, who is out on bond and presently seated to

7    my left-hand side, John Rapawy.

8          MR. KALEY:  Good afternoon, your Honor, John Kaley.  I

9    was appointed to represent Marcin Jakacki and our appointment,

10   your Honor, just so you're aware of, was for bail purposes

11   only.

12         THE COURT:  Is it because he's planning to get other

13   counsel or because you were not available to represent him

14   throughout or what?

15         MR. KALEY:  I think, your Honor, Magistrate Judge

16   Francis, having seen the financial affidavit, concluded that

17   Mr. Jakacki would have the wherewithal to hire counsel and

18   specifically indicated that I was appointed for purposes of

19   bail only.

20         THE COURT:  Let me hear from your client as to what

21   his intentions are.

22         MR. KALEY:  Your Honor, his intentions are, we would

23   have anticipated making bail and him hiring counsel.

24         THE COURT:  Has he made bail or not?

25         MR. KALEY:  Not yet, your Honor.

1        THE COURT:  What are the bail conditions?

2        MR. KALEY:  The bail conditions are a $1 million

3   personal recognizance bond cosigned by three financially

4   responsible people and secured by the family's home.

5        THE COURT:  What's his relation to the other defendant

6   who was just introduced?

7        MR. KALEY:  He's Lilian Jakacki's husband, your Honor.

8   No relation.

9        THE COURT:  I see.  We will deal more with this in a

10  minute.  Sir.

11       MR. FLOOD:  Good afternoon, Christopher Flood, Federal

12  Defenders of New York, of behalf of Lilian Jakacki.  Like my

13  brethren to my left, our office was appointed for bail purposes

14  only by Magistrate Judge Francis after reviewing the financial

15  affidavit.

16       THE COURT:  I will make my own review of the financial

17  affidavits, but I am appointing both of you until substitute

18  counsel is retained for all purposes.

19       MR. FLOOD:  I certainly understood that to be true.

20  Any time for bail purposes, certainly any time the government

21  would be approaching Ms. Jakacki, I would expect that to be for

22  all purposes until substitute counsel be appointed.

23       Our understanding is that Ms. Jakacki, there are three

24  actions against her currently.  There is a criminal action,

25  there is an administrative action by the DA, and a civil action

1    as well.  Our understanding is she is seeking one counsel to

2    handle all three, which would make a lot of sense, and we are

3    trying assist her with that.

4              (Continued on next page)

```
 1              THE COURT:  OK.  So let me ask, what's the story on

 2    the company?

 3              MR. FLOOD:  In terms of --

 4              THE COURT:  So they're, I guess, two corporate

 5    defendants, M&W Global Enterprises and European Apothecary,

 6    Inc.

 7              And let me ask government counsel, so they have been

 8    served?

 9              MR. PELLEGRINO:  I believe they have, your Honor.

10              THE COURT:  How can you not know the answer to that?

11              MR. PELLEGRINO:  Your Honor, our understanding is that

12    Lilian Jakacki, the defendant, is the sole owner --

13              THE COURT:  So what?

14              MR. PELLEGRINO:  -- of both companies.

15              THE COURT:  It is a corporation.  Entities are a

16    corporation, and they certainly seem to me, since the

17    Indictment says I-n-c period after each, they have to be served

18    either through the Secretary of State or their place of

19    business or something like that, and I would have thought the

20    government would know that.

21              MR. PELLEGRINO:  Your Honor, I believe they have been

22    served at their place of business.  Insofar as --

23              THE COURT:  I will want to know that by no later than

24    noon tomorrow through a written communication from the

25    government.  Also send it to all counsel.
```

 1            MR. PELLEGRINO:  We will confirm that, your Honor.

 2            MR. KALEY:  Your Honor, I just wanted to, so that I am

 3       clear, there were some other bail conditions about electronic

 4       monitoring and home detention.

 5            THE COURT:  Yes.  Thank you for mentioning that.

 6            So since these are apparently -- both corporations are

 7       solely owned by the defendants?

 8            MR. PELLEGRINO:  That is the government's belief and

 9       we checked with the Secretary of State, your Honor.

10            THE COURT:  So what is being done to get counsel for

11       the corporations?

12            MR. FLOOD:  Well, your Honor, I was informed by the

13       government about this in the hallway.  So that's the first we

14       have heard of that.

15            Certainly it would be in Ms. Jakacki's interest to

16       pursue counsel for the corporations as well.

17            THE COURT:  Yes.  The corporation cannot appear except

18       by counsel.

19            MR. FLOOD:  Right.

20            THE COURT:  So she or any of the individual defendants

21       won't be able to represent, through their own counsel or

22       otherwise, the corporation unless they have counsel.

23            MR. FLOOD:  Certainly that is not something the

24       Federal Defenders can speak to right now, but that is something

25       I will inform the Court.  I will talk to Ms. Jakacki about and

 1    I can't give a representation about now.

 2             THE COURT:  All right.  So let me ask counsel for each

 3    of the defendants -- well, we'll start with Lilian Jackie.

 4             Has your client read the Indictment?

 5             MR. FLOOD:  Yes.

 6             THE COURT:  Have you discussed it with her?

 7             MR. FLOOD:  Yes, I have, your Honor.

 8             THE COURT:  Do you wish to have it read here in open

 9    court, or do you waive the reading?

10             MR. FLOOD:  We waive the reading.

11             THE COURT:  Do you wish a plea of not guilty to be

12    entered?

13             MR. FLOOD:  Yes.

14             THE COURT:  A plea of not guilty will be entered.

15             Marcin Jackacki.

16             MR. KALEY:  Yes, your Honor.  I reviewed the

17    Indictment with Mr. Jackie.  We have discussed the charges.  We

18    will waive the reading of the Indictment and ask the Court to

19    enter a plea of not guilty.

20             THE COURT:  A plea of not guilty will be entered.

21             And Robert Cybulski.

22             MR. RAPAWY:  Yes, your Honor.  I've reviewed the

23    Indictment with my client and gone over it.  We waive its

24    public reading, and we ask the Court to enter a plea of not

25    guilty.

1           THE COURT:  A plea of not guilty will be entered.

2           And I will, for present purposes, have a plea of not

3  guilty on behalf of the two corporations entered as well.

4           Now, how long does the government want for the

5  completion of discovery?

6           MR. PELLEGRINO:  Your Honor, we are requesting one

7  month.

8           THE COURT:  Why so long?

9           MR. PELLEGRINO:  Because it is a complicated case.  It

10 is the product of a two-year investigation.

11          THE COURT:  A complicated case?  Were you here at the

12 closing arguments of the LIBOR case?

13          MR. PELLEGRINO:  I was, your Honor, for part of them.

14          THE COURT:  They didn't need a month, and I'm quite

15 sure that that was more complicated than this case.

16          What does the discovery consist of?

17          MR. PELLEGRINO:  So we have thousands of pages of

18 records that consist of prescription records relating to the

19 healthcare fraud scheme, over 1300 prescriptions that have been

20 reviewed as part of the narcotics conspiracy.  All that

21 information has to be reviewed, potentially redacted for

22 patient and PII information.  And to that end, we would request

23 permission to provide a protective order from the Court to

24 allow us to review that and produce it on a protected basis.

25          There is additional bank records that were subpoenaed

1    from banks, ordering records for controlled substances, an

2    audit that was conducted in 2013 that tracked over half a

3    million or over 400,000 pills, the point of the narcotics

4    charges.  And there is further discovery relating to undercover

5    buys, recorded telephone calls, video prescriptions that were

6    filled.  And there is some additional outstanding material,

7    your Honor.  October 29 we executed additional search warrants

8    in the defendants' house where we found, among other things,

9    cash, blank prescription forms, financial documents, a laptop

10   and a tablet, which need to be reviewed and then produced.  And

11   we also did a search warrant of defendants' pharmacy --

12           THE COURT:  When did you do all of this?  When did you

13   do the searches?

14           MR. PELLEGRINO:  Why did we do this, your Honor?

15           THE COURT:  When?

16           MR. PELLEGRINO:  Oh, when.  The searches were

17   performed on October 29, your Honor.  There were multiple

18   warrants for --

19           THE COURT:  OK.  Now, that's the first of the things

20   you mentioned that seems to me even plausibly warrant such an

21   extended discovery period as one month, but I will give you one

22   month.  Don't come back and ask for any more time.

23           MR. PELLEGRINO:  OK.  Thank you, your Honor.

24           THE COURT:  So that will be Friday, December 2nd.

25           How long does defense counsel want for the making of

1  any motions?  And let me say this.  As far as I'm concerned,

2  counsel who are presently representing the two defendants, who

3  are now appointed for all purposes until further order of the

4  Court, need to move forward promptly.  Having said that, since

5  I haven't reviewed the financial affidavits yet, I will send

6  them to the magistrate judge who is not without pause to raise

7  the problems he raised.  So I would expect that counsel for the

8  defendants could be obtained within the next two weeks.

9          I'm sure there is nothing more pressing for your

10 clients than not paying counsel, and with your help, I'm sure

11 they could do so.  But having said that, how long does counsel

12 want for the making of any motions?

13         MR. FLOOD:  Your Honor, I didn't hear from the

14 government.  Are there any statements?

15         THE COURT:  Are there any statements of the

16 defendants?

17         MR. PELLEGRINO:  I don't know at this time, your

18 Honor.  I am not aware of any.

19         THE COURT:  You know, counsel, if you come to this

20 court again, you had better be better prepared.  This is not

21 acceptable.  This is an initial conference.  You should have

22 known whether the defendants have been served.  You should have

23 known what Rule 16 materials were to be provided.  This is

24 like, forgive me, 101 in prosecution.  Let's not have it happen

25 again.

1          MR. PELLEGRINO:  OK.  Your Honor.

2          THE COURT:  Go ahead.

3          MR. FLOOD:  Your Honor, what I am hearing is that it

4    is voluminous and it will take some time to get through to

5    review.  And I will ask through the Court one additional

6    question.  Are these recordings in English?

7          MR. PELLEGRINO:  They are, your Honor.

8          THE COURT:  OK.

9          MR. FLOOD:  That will expedite some of the review.

10          THE COURT:  So I understood.  It is a language that

11   some lawyers do speak.

12          MR. FLOOD:  Besides that, but I don't want to

13   overestimate.  With the holidays, I would think about a month

14   to be able to come back.

15          THE COURT:  Here's what I am going to do.  I'm going

16   to give you six weeks, because I am hopeful that within two

17   weeks new counsel can be obtained and then I will give them a

18   month to get up to speed and make any motions.  So thank you

19   for being prudent in your request, but I think six weeks is

20   called for in this situation.  So we have the holidays as well.

21          So, let's see.  Six weeks.  By the way, I think I said

22   Friday, December 2nd.  That is a Wednesday.

23          THE CLERK:  Correct.

24          THE COURT:  So Wednesday, January 13th, for all

25   motions.

```
 1              We will have another hearing -- let's look at
 2   January 15th.
 3              THE CLERK:  January 15th, a Friday, just the trial
 4   day.
 5              THE COURT:  OK.  So we'll have a hearing at 4 o'clock
 6   on January 15th.  At that time if motions have been made and
 7   they can be dealt with orally, they will be.  If they require a
 8   written response, we will set a schedule then for written
 9   response.  And in any event, we will then set a trial date.
10              And pursuant to Section 3161 of Title 18, I will
11   exclude from calculations under the Speedy Trial Act all time
12   between now and January 15th.  I find that such time is
13   necessary for the completion of discovery and the drafting of
14   motions.  And that for those and other reasons from this
15   transcript, the best interests of the defendants in excluding
16   such time substantially outweighs the interests of the
17   public -- I will start that one all over again.  The best
18   interest of justice in excluding such time substantially
19   outweighs the interests of the defendants and the public in a
20   speedy trial.
21              Now, anything else we need to take up today?
22              MR. PELLEGRINO:  Your Honor, one other issue.  The
23   government wishes to revisit the detention and bail condition
24   determination that Judge Francis made on Thursday.  In
25   particular, at a minimum, we feel that the home should not be
```

1  appropriate collateral in this situation, that the home is the

2  object of the narcotic conspiracy.

3          THE COURT:  What is the flight risk here?

4          MR. PELLEGRINO:  Your Honor, we think there is

5  significant flight risk.  Perhaps it was underestimated by

6  Judge Francis.  Specifically, there is a place to flee to,

7  namely, Poland.  Mr. Jakacki is a Polish national.  He holds a

8  Polish passport, green card.  He has traveled to Poland in the

9  past on at least three occasions in the last ten years.

10         Ms. Jakacki is an American citizen, but she has held a

11  Polish passport in the past.  We believe she speaks fluent

12  Polish.  We believe that there are few ties to the community

13  that are not the subject of this investigation.  There are no

14  elderly or children at home, which would have them be rooted to

15  the house.

16         In addition, they have their businesses but the

17  businesses have also been indicted.  The DEA, as Mr. Flood

18  mentioned, has issued an immediate suspension order, which

19  means that the pharmacy will not be able to continue to

20  operate -- at least the narcotics or controlled substances

21  portion of the business.  There is also the healthcare fraud

22  charges which may affect the pharmacy's ability to operate with

23  respect to the prescription side of the house.

24         In addition, we believe that the case is strong; that

25  the Indictment alleges that the conspiracy, the narcotics

 1   conspiracy, generated hundreds of thousands of dollars which

 2   was specifically laundered to purchase the home in Greenwich,

 3   and the product of that conspiracy was over half a million

 4   pills that were put out into the street.

 5          So although they are first-time offenders, the charges

 6   are very serious.  The maximum potential charges under the

 7   guideline --

 8          THE COURT:  You said two different things here.  That

 9   the charges carry heavy penalties is, of course, relevant, but

10   I didn't hear you saying why you felt the case was strong.  You

11   just said what the Indictment said.

12          MR. PELLEGRINO:  Specifically, your Honor, I think

13   that there is an overwhelming amount of evidence both in the

14   civil complaint and in the criminal indictment --

15          THE COURT:  Like what?

16          MR. PELLEGRINO:  Which specifically controlled buys on

17   video and with audio.  Specifically, 1300 prescriptions that

18   DEA reviewed on an individualized basis, including talking to

19   doctors to confirm that the prescriptions were either falsified

20   or forged, and --

21          THE COURT:  Did you ask the magistrate to make a

22   finding just on flight or was there also a question of danger

23   to the community?

24          MR. PELLEGRINO:  It was on flight, your Honor.

25          THE COURT:  OK.  So let me -- I'll come back to the

 1    government in a minute, but let me hear from defense counsel.

 2             MR. FLOOD:  Your Honor, first off, all this

 3    information was presented to the Magistrate on Thursday.  So

 4    there has been no changed circumstances that we have --

 5             THE COURT:  I can review it de novo, as you know.

 6             MR. FLOOD:  Of course.  But that being said, changed

 7    circumstances would be relevant and there have been none other

 8    than us meeting the substantial portion of the bond conditions

 9    set by Judge Francis.  That is, he imposed on Ms. Jakacki five

10    cosigners for a million-dollar bond, and as we speak I believe

11    the government is approving the fifth cosigner right now, who

12    is a licensed attorney in the Southern District of New York.

13    There are four others who have already been approved by the

14    government.

15             Setting aside the question about the home entirely,

16    that is five people from the community who the government has

17    already approved who are hock for a million dollars.

18             She is 49 years old -- 59, pardon me.  She is a

19    lifelong resident of the Second Circuit.

20             THE COURT:  You can take the Fifth on what your age is

21    if you want to.

22             MR. FLOOD:  She totally can.  It is a total brain lock

23    on my part.

24             But from Greenwich, Connecticut, she has lived there

25    her entire life.  And the only two factors that Pretrial

1   Services found going to flight risk, the only two, were that

2   she had international travel ten years ago.  She hasn't

3   traveled internationally in over ten years.  And an expired --

4   expired -- passport, which I believe has already been seized.

5          So this is not a case that says flight risk on its

6   face.  Certainly the government wants detention but it is

7   simply --

8          THE COURT:  What about her husband?

9          MR. FLOOD:  Now, that is a different story.  I don't

10   represent him.

11          THE COURT:  I don't see why it is any different story.

12   If he was a flight risk, he would be tempted to take her with

13   him.

14          MR. FLOOD:  But if she has no means of doing so,

15   number one --

16          THE COURT:  Well, the question -- I disagree.  I have

17   to look at all the relevant facts and circumstances.  So I will

18   hear, of course, in a minute from his counsel.  But, for

19   example, you mentioned that she has not traveled abroad for ten

20   years -- I think more than ten years I think you said.  What

21   about her husband?

22          MR. FLOOD:  Whether he has traveled or not?  I don't

23   know the factual answer to that so I can't be candid with the

24   Court.

25          THE COURT:  All right.  We will hear from him.

1          MR. FLOOD:  I don't know.  But I know this Court

2    recently, in a case I had, the Court has been innovative in

3    terms of family members, travel documents and things like that.

4    When seizing other people --

5          THE COURT:  You think just because you won that case

6    that you get a special get-out-of-jail-free card?

7          MR. FLOOD:  Not at all.  But in terms of thinking

8    about other people's travel and saying -- in securing other

9    people's -- other people in the family, the incentive for other

10   people to flee, if that's the kind of thinking that the Court

11   is undertaking right now, the fact of the matter is this.  With

12   regards to Ms. Jakacki, her family --

13         THE COURT:  Just take that other case, and every case

14   is different.  Your client in that case had every reason to

15   stay.

16         MR. FLOOD:  Right.

17         THE COURT:  Right?

18         MR. FLOOD:  And the people that have come forward to

19   the tune of a million dollars each are two of her sisters, who

20   are professionals and have everything to lose -- their

21   retirement, their savings, because they've signed on for a

22   million-dollar bond.

23         THE COURT:  What do they do?

24         MR. FLOOD:  One is an attorney.  One is a professional

25   at the hospital; I believe she is a pharmacist.  There is

 1    another family friend who is a secretary, who doesn't have

 2    much, but she would be completely ruined if Ms. Jakacki made

 3    the unwise decision to flee because the bond would completely

 4    wipe her out.  There is another family -- a niece who is just

 5    getting started in life, who makes $50,000 a year.  She would

 6    be wiped out completely.

 7            THE COURT:  How does she qualify for a million

 8    dollars?

 9            MR. FLOOD:  The government approved it.

10            Then there is a fifth family friend who is about to be

11    approved who has a very substantial, six-figure income, who is

12    a licensed attorney, again, in this district with very

13    substantial savings.  Which, by the way, of the five, three of

14    them own their homes.  So there's assets, again -- own their

15    homes in the New York City area, so we know that that's

16    substantial value, which, again, secures this bond

17    substantially.

18            THE COURT:  What are the other conditions?

19            MR. FLOOD:  So there's I believe it is GPS monitoring.

20    My brethren counsel will correct me if I am wrong if it is not

21    GPS.  But it is home detention.  Is that correct?

22            MR. KALEY:  Home detention and electronic monitoring.

23            MR. FLOOD:  So there is that, which includes, of

24    course, strict pretrial supervision.  She will be in the

25    District of Connecticut in the home.  Travel restrictions to

1  Southern and Eastern and the District of Connecticut.  And I

2  believe that's -- and then home, of course.

3          THE COURT:  OK.  Before I think about your client

4  further, let me hear from Mr. Kaley on his client.

5          MR. KALEY:  Your Honor, Mr. Jakacki, your Honor, is a

6  legal resident.  He has a green card.  He hasn't been back to

7  Poland I think in eight or nine years.  He came here --

8          THE COURT:  How long has he been here?

9          MR. KALEY:  I think about nine years ago.  So he has

10 basically been here.  He has been married for five years.  They

11 live together in Connecticut.

12         He has no convictions.  He has one, I think --

13         THE COURT:  What was the basis for his coming here?

14         MR. KALEY:  He came on a tourist visa, your Honor, and

15 then applied to stay and was permitted to stay.

16         I noted from the Pretrial Services report that he had

17 been given a desk appearance ticket at one point somewhere in

18 the city for possession of a knife, but the report indicated

19 that it was dismissed.  So he has no prior criminal record.  He

20 was leading a life with his wife.

21         The bond, a million dollars --

22         THE COURT:  How old is he?

23         MR. KALEY:  36, your Honor.

24         The bond, a million dollars, cosigned by three

25 financially responsible people secured by the same home,

1    electronic monitoring.  So he is not going to be --

2            THE COURT:  Have any of those people been -- or is it

3    the same people?

4            MR. KALEY:  I think it will largely be some of the

5    same people, your Honor, and perhaps one additional one.

6            The government, I would assume, when they searched the

7    home took the passport.  If not, we've agreed that we'll

8    surrender the passport.

9            He had some firearms in the home that he had licenses

10   for, and I believe that when the agents conducted the search

11   Thursday or Friday of last week, they took those.  So that's no

12   longer an issue.

13           He has every reason to be here and to defend himself.

14   And the conditions that Magistrate Judge Francis determined --

15           THE COURT:  All right.  Let me hear from the

16   government again.  Thank you.

17           MR. PELLEGRINO:  Your Honor, going to the point --

18           THE COURT:  So is the only basis for flight the fact

19   that Mr. Jakacki is from Poland?

20           MR. PELLEGRINO:  No, your Honor.  It's also the belief

21   that there are large sums of money that were generated by this

22   scheme which would enable them to flee.

23           In addition, Mr. Jakacki faces potential immigration

24   consequences if he is convicted, and also the belief that as a

25   result of the charges that they're facing, there might be a

1    significant incentive to flee because of the seriousness of

2    them and the evidence involved in the charges and the fact that

3    their livelihood is essentially a part of this --

4              THE COURT:  How could you approve a million-dollar

5    bond from someone who is just getting started and has, if I

6    heard correctly from Mr. Flood, a $50,000 a year income?

7              MR. PELLEGRINO:  I believe it was approved, your

8    Honor.

9              THE COURT:  Pardon?

10             MR. PELLEGRINO:  That was approved, but --

11             THE COURT:  Why was it approved?

12             MR. PELLEGRINO:  I think, your Honor, the reason is

13   because the home is the collateral, and that was one of the

14   things that we have an issue with since the home is the object

15   of one of the conspiracies, of the narcotics conspiracy.  We

16   don't believe that it is appropriate collateral, but I think

17   with that collateral that approval was possible.

18             THE COURT:  Well, I mean, the reason I'm raising that

19   is the government seems to be inconsistent in that on the one

20   hand you say you want these defendants detained because they

21   are a flight risk and yet certain steps that the Magistrate

22   Judge gave you to help ensure against flight, such as

23   obtaining, with the government's approval, bonds from persons

24   who would really stand to lose a very substantial amount of

25   money if there were flight, you have not treated as a serious

1    requirement.  And if approved, for example, if I understand the

2    case, one and maybe two of the bonds people are from people who

3    couldn't remotely be good for a million dollars.

4              MR. PELLEGRINO:  That is correct, your Honor.  It is

5    based on the collateral of the home.

6              THE COURT:  All right.  Well, I'm going to think about

7    it and I will make a decision by sometime tomorrow since it

8    seems obvious that they even under the present bail conditions

9    are not going to realize those conditions tonight and so I will

10   issue an order tomorrow on my determination.

11             Anything else we need to take up?

12             MR. PELLEGRINO:  Just one other brief issue, your

13   Honor.

14             If you elect not to change the bail conditions, we

15   would just request that the firearms remain surrendered.

16             THE COURT:  Any objection to that?

17             MR. FLOOD:  No, your Honor.

18             THE COURT:  No.  OK.  That is fine.

19             MR. PELLEGRINO:  Thank you, your Honor.

20             THE COURT:  All right.  Anything else from the

21   defense?

22             MR. KALEY:  No, your Honor.

23             THE COURT:  Very good.  Thanks very much.

24             MR. PELLEGRINO:  Thank you, your Honor.

25                            -  -  -