

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 21, 2015

**BY EMAIL**

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

Re: *United States* v. *Marcin Jakacki*,
15 Cr. 727 (JSR)

Dear Judge Rakoff:

The Government respectfully submits this letter in opposition to the defendant's application for bail (hereinafter "Def. Mot.") in the above-captioned case, and in advance of the bail hearing scheduled for December 22, 2015, at 4:00 pm.

The defendant is charged with (i) conspiring to distribute and possess with the intent to distribute oxycodone, in violation of Title 21, United States Code, Section 846; (ii) conspiring to commit money laundering, in violation of Title 18, United States Code, Section 1956(h); and (iii) money laundering, in violation of Title 18, United States Code, Section 1956. The defendant was arrested by the Drug Enforcement Administration (the "DEA") on October 28, 2015. On October 29, 2015, the defendant was presented before Magistrate Judge James C. Francis IV. Judge Francis denied the Government's application for detention and ordered that the defendant be released upon the following bail conditions (i) a $1 million bond, to be signed by three financially responsible persons and secured by the home shared by the defendant and his co-defendant and spouse, Lilian Jakacki, a/k/a "Lilian Wieckowski" ("Wieckowski"); (ii) home detention with electronic monitoring; (iii) surrender of all travel documents, with no new applications; (iv) defendant's travel restricted to the Southern District of New York, Eastern District of New York, and the District of Connecticut; and (v) surrender of all firearms in the defendant's possession. On November 3, 2015, at the defendant's arraignment, the Government

renewed its argument that the defendant should be detained.[1] In a written decision, dated November 4, 2015 (the "November 4 Decision"), the Court ordered that the defendant be detained pending trial.

In the November 4 Decision, the Court found that detention was appropriate because the defendant posed a risk of flight based on a number of factors, including (a) the significant penalties associated with the crimes charged against the defendant; (b) the defendant's relatively short residency in the United States; (c) the defendant's familial ties to Poland, including financial support provided by the defendant to his son in Poland; (d) the weight of the evidence described in the Indictment; and (e) the defendant and his co-defendant's financial resources. The defendant now moves for reconsideration of the Court's detention decision. For the reasons set forth below, the Government respectfully submits that the Court should adhere to its initial determination and deny the defendant's application.

**A. Legal Standard**

The Indictment in this case charges the defendant with, among other offenses, conspiracy to distribute and possess with intent to distribute narcotics, in violation of 21 U.S.C. § 846, which, in this case, carries a statutory maximum term of imprisonment of 20 years. Accordingly, the Court's consideration of the defendant's application is governed by 18 U.S.C. § 3142(e)(3)(B), which imposes a rebuttable presumption that "no condition or combination of conditions will reasonably assure" the appearance of the defendant and the safety of the community. In such a case, the defendant bears the burden of production and must present evidence to rebut the presumption in favor of detention. *United States* v. *Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). "[A]n indictment returned by a duly constituted grand jury conclusively establishes the existence of probable cause for the purpose of triggering the rebuttable presumptions set forth in § 3142(e)." *United States* v. *Contreras*, 776 F.2d 51, 55 (2d Cir. 1985). Moreover, even if the defendant can successfully rebut the presumption in favor of detention, the presumption does not disappear; rather, it "remains a factor to be considered among those weighed by the district court." *Mercedes*, 254 F.3d at 436. Ultimately, the Government always bears the burden of persuasion as to the necessity of detention. *Id.*

In considering the defendant's application for bail, the Court must consider four factors:

> (1) The nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves . . . a controlled substance [or] firearm . . .;
>
> (2) The weight of the evidence against the person;
>
> (3) The history and characteristics of the person, including (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the

[1] On November 3, the Government also renewed its argument that Wieckowski should be detained. The Court denied the Government's request with respect to Wieckowski.

> community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) The nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g). A district court's assessment of these factors and determination with respect to detention is reviewed deferentially, for clear error. *United States* v. *English*, 629 F.3d 311, 319 (2d Cir. 2011). As set forth below, these factors collectively weigh heavily against granting the defendant's application.

**B. <u>Discussion</u>**

*1. Nature and Circumstances of the Offenses Charged*

As set forth in the Indictment, the defendant is charged with conspiring to distribute hundreds of thousands of tablets of oxycodone illegally, and then conspiring to and laundering the proceeds of that illicit narcotics trafficking. Through pharmacies registered and operated by Wieckowski, the defendant and his co-conspirators, including his spouse, illegally diverted more than 500,000 tablets of oxycodone. (Indictment ¶¶ 7-19). Indeed, as alleged in the Indictment, the illegal distribution of oxycodone continued until as recently as October 2015. (*See id*. ¶¶ 18-19). The defendant and Wieckowski then proceeded to launder the hundreds of thousands of dollars generated from these illegal oxycodone sales through a series of financial transactions, which ultimately culminated in the purchase of a home in Greenwich, Connecticut (the "Greenwich Home") that was valued at approximately $2 million. (*See id*. ¶¶ 35-38).

In light of the nature and circumstances of these offenses, the defendant cannot rebut the presumption against bail. Initially, the statute expressly calls for the Court to consider whether an offense involves controlled substances in determining whether bail is appropriate. *See* 18 U.S.C. § 3142(g)(1) (listing whether the offense involved controlled substances as one of the factors to be considered when weighing the nature of the offense charged). Additionally, as the Court noted in the November 4 Decision, the seriousness of the controlled substance and money laundering offenses charged here is demonstrated by the 20-year statutory maximum term of imprisonment applicable to violations of Title 21, United States Code, Section 846 and Title 18, United States Code, Section 1956. *See* November 4 Decision at 2 (finding that the defendant presented a flight risk because, among other reasons, he "is charged in three counts with serious offenses that carry maximum sentences of up to 20 years in prison.").

The defendant tries to minimize the obvious incentive to flee that these significant potential sentences create by arguing that, in reality, the defendant's Guidelines exposure is not so dire. The defendant's asserted Guidelines range is, simply put, drastically understated. With

respect to the illegal oxycodone count, the defendant asserts that, at most, the defendant faces 63 to 78 months' imprisonment. The defendant reaches this range based on a figure of 500,000 diverted tablets. The defendant further claims that the Indictment does not specify the dosage of the illegally distributed tablets, and therefore uses the drug equivalency for a "depressant" under the Guidelines to reach the offense level.

Even using 500,000 tablets,[2] the defendant's reliance on the "depressant" drug equivalency is wrong. The Indictment repeatedly notes that the conspiracy involved the diversion primarily of 30-miligram tablets of oxycodone, and, at trial, the Government will prove that the vast majority of the illegally-distributed oxycodone was in 30-miligram tablet form.[3] (*See* Indictment ¶ 13 (alleging that one of the defendant's co-conspirators would typically obtain at more than 500 30-miligram oxycodone tablets per visit); ¶ 19 (alleging that in or about September and October 2015, an undercover agent was able to purchase more than 700 30-miligram tablets illegally from the defendant and Wieckowski)). Accordingly, when calculating the potential Guidelines sentence, the Government respectfully submits that the 30-miligram tablet weight is the appropriate measure.

Using this tablet weight, and the 500,000 tablets, the resulting offense level is well beyond the level 26 asserted by the defendant. Rather, based purely on drug weight, the potential offense level is a level 38, calculated as follows:

- 500,000 tablets * 30 milligrams per tablet = 15,000,000 milligrams of oxycodone.

- 15,000,000 milligrams/1,000 milligrams per gram = 15,000 grams of oxycodone.

- Pursuant to U.S.S.G. § 2D1.1 App. Note 8(D), 1 gram of oxycodone equals 6,700 grams of marijuana. Accordingly, 15,000 grams of oxycodone * 6,700 grams = 100,500,000 grams of marijuana.

- 100,500,000 grams of marijuana/1,000 milligrams per gram = 100,500 kilograms of marijuana.

- Pursuant to U.S.S.G. § 2D1.1(c)(1), 100,500 kilograms of marijuana equates to a level 38.

In addition, given that the oxycodone distribution conspiracy effectively used Wieckowski's pharmacies as "pill mills," the Government submits that, pursuant to U.S.S.G. § 2D1.1(b)(12), an additional 2-point enhancement would apply, yielding an offense level of 40. Even providing for a 3-point reduction for acceptance of responsibility and that the defendant's Criminal History

---

[2] At trial, the Government expects that the evidence would show that the conspiracy involved the illegal distribution of substantially more than 500,000 tablets of oxycodone.

[3] The Indictment notes that oxycodone is typically dispensed in dosages ranging from 5 to 80 milligrams. (*See* Indictment ¶ 4).

Category is I, the resulting Guidelines range is 210 to 262 months of imprisonment.[4] As the Court has already found in the November 4 Decision, a potential prison sentence of approximately 20 years is a powerful incentive for the defendant to flee.

The defendant also appears to argue that his potential sentence may not be so severe because the Indictment alleges specific acts by the defendant that occurred in or about September and October 2015. The defendant argues, therefore, that his involvement in the conspiracy may be limited to that time period. Again, the defendant's argument misses the mark. The defendant's participation in the narcotics conspiracy began well before 2015. For example, as described in the portion of the Indictment that describes the money laundering charges, the defendant substantially profited from the illegal oxycodone trafficking, purchasing the Greenwich Home in 2012 using those illicit proceeds. (*See* Indictment ¶¶ 35-38). Particularly at this point, in advance of trial, there is no reason to believe that the defendant would not be held accountable for the full drug weight attributable to the narcotics conspiracy orchestrated by himself and his wife.

As the Court found in the November 4 Decision, the seriousness of the offenses alleged and the length of the potential sentence create a significant incentive for the defendant to flee. The Government respectfully submits that the defendant, in light of this incentive, cannot overcome the presumption against bail.

*2. The Weight of the Evidence*

Moreover, it is not simply the severity of the possible sentences standing alone that creates a risk of flight, but also the strength of the case against the defendant. As the Court held in the November 4 Decision, the Indictment lays out "significant evidence" of the defendant's involvement in the charged offenses. *See* November 4 Decision at 2. The evidence identified in the Indictment, some of which the Court highlighted in its decision, includes:

- A thorough audit of the oxycodone stock at Wieckowski's pharmacies, which shows that more than 400,000 of tablets of oxycodone could not be accounted for with a prescription;

- Prescriptions written by individuals other than the physician who was listed on the prescription;

- Bank records showing transfers of hundreds of thousands of dollars of proceeds flowing through bank accounts belonging to Wieckowski, many of which were claimed by Wieckowski to be wedding gifts, loan repayments, or gifts from the defendant to Wieckowski;

[4] Pursuant to U.S.S.G. § 2S1.1(a), the base offense level for the money laundering charges would be the same as the offense level for the underlying offense, which, in this case is the narcotics offense discussed above. Accordingly, regardless of the disposition of the money laundering counts, the applicable offense level would still be at least 40.

- Undercover recordings in which the defendant arranges the illegal sale of hundreds of tablets of oxycodone to an undercover agent.

In addition to the evidence laid out in the Indictment, a search conducted of the Greenwich Home shortly after the defendants' arrest, also uncovered, among other things, blank prescription forms in the defendants' house. An example of the prescription forms is attached hereto as Exhibit A.

The defendant does not address the weight of the evidence in his application. But pursuant to the bail statute, the strength of the case against the defendant is a factor for the Court to consider in weighing a bail application. And here, as the Court noted in the November 4 Decision, the evidence against the defendant, particularly when coupled with the substantial sentence that the defendant faces, gives the defendant very significant reasons to abscond. Accordingly, this factor, too, weighs in favor of detention.

*3. The History and Characteristics of the Defendant*

The defendant's submission focuses primarily on what he claims to be inaccuracies concerning his ties to Poland and the United States, and his financial resources, in the Court's November 4 Decision. In reality, however, the defendant's submission only shows that the Court's original determination was correct, and that the defendant's history and characteristics show that he is a flight risk.

First, the defendant claims that the Government and the Court overstated the defendant's ties to Poland. The defendant does not dispute, however, that he arrived in the United States less than a decade ago and that accordingly, his "length of residence in the United States is relatively short." *See* November 4 Decision at 2. Moreover, the defendant does not dispute that he has a child in Poland. Instead he claims that the Court and the Government placed too much weight on this relationship because they incorrectly believed that the defendant sent money to his son on a monthly basis, when in fact, the defendant provided a lump sum to his parents for the purpose of providing for his son. Initially, as the Court noted in its decision, the information concerning the defendant's payments to his son were drawn from the defendant's financial affidavit, not the Government's assertion. *See id*. ("Moreover, his financial affidavit reveals that he has a son from a previous marriage who resides in Poland to whom he sends money on a monthly basis, evidencing his family ties to Poland."). Furthermore, regardless of the precise structure of the financial arrangements the defendant has made for his son, he cannot dispute that he has provided for his son. Similarly, the defendant cannot claim that he has no relationship with his son, because he acknowledges that he speaks with his son two or three times a year. While the bond between the defendant and his son may not be strong as some, the fact of the matter is, even accepting the defendant's recent characterization of that relationship, there is a bond.

The same is true of the defendant's relationship with his parents in Poland. He claims now that he is "estranged" from his parents in Poland. But the defendant also entrusted his "estranged" mother with money for his son in 2012, which was to be administered "at their

discretion and without any oversight or direction from [the defendant]." (*See* Def. Mot. at 9). Entrusting thousands of dollars provisioned for your son's care to the discretion of one's parents is not consistent with estrangement. And even though the defendant claims that he has not spoken with his mother since that trip in 2012, he himself acknowledges that he did see her, even if only once, when she visited the United States. As with his son, while the defendant's relationship with his parents may be distant or even strained, it is undisputed that the relationship in fact exists.

The defendant's attempts to minimize his relationships with his son and his parents notwithstanding, the Court's conclusion that the defendant had "family ties" to Poland is amply supported by the record. When taken in conjunction with the seriousness of the offenses with which the defendant is charged and the potential penalties, that connection prevents the defendant from overcoming the presumption against bail.

Second, the defendant argues that he has strong ties to the community through his wife and wife's family, some of which are willing to act as co-signers for his bond. To that end, the defendant has submitted several letters in which Wieckowski's family members discuss the alleged closeness between Jakacki and their family. But while the defendant did not submit a letter himself, his own words undercut his contention that he is so connected to his wife's family that he would not harm them by fleeing. In particular, as acknowledged by the defendant and as demonstrated in the defendant's prison calls, the defendant has been engaged in an affair with a woman ("Female-1") for some time, which has continued even after the defendant was detained. This infidelity is not offered by the Government to prove that by definition, the defendant and his wife or her family cannot have a relationship. But during the course of recorded conversations between the defendant and Female-1, the defendant has staked out a position that stands in stark contrast to his claimed position that he simply wants to be released so that he can live with his wife at home. For example, on or about November 14, 2015, in a recorded prison call, the defendant told Female-1, in substance and in part,[5] that, if the defendant was released and placed on electronic monitoring, the defendant would leave the Greenwich Home and live with Female-1. That, of course, is a flat contradiction of the defendant's assertion that he wishes to resume his normal life with his wife and her family.

The defendant tries to minimize this contradiction through statements from his wife and her family that they have forgiven him for his indiscretion. Neither the Court nor the Government has any way of knowing whether that is true. But whether their forgiveness is sincere or not is irrelevant. Here, the relevant question is whether the potential financial ruin of his co-signers if the defendant flees will cause the defendant to abide by the conditions of his bail. Whether the defendant's co-signers have accepted his failings and are willing to continue to view him as family sheds no light on how the defendant views his co-signers. And in this case, where the defendant has already stated that he does not even intend to continue to live with his wife casts serious doubt on his level of commitment to his wife's family, particularly when the defendant is facing the very real possibility of spending many years in prison.

---

[5] The conversations between the defendant and Female-1 are in Polish. A summary of the conversation was prepared for the Government by a Polish-speaking agent. The summary, and the call itself, were provided to defense counsel before the defendant submitted his bail application. The defendant did not dispute the accuracy of the summary.

Third, the defendant argues that the Court erred in finding that he and his wife had financial resources sufficient to make him a flight risk. In particular, the defendant claims that, despite the information provided in Wieckowski's financial affidavit, the couple, in fact, do not have significant assets and are struggling with approximately $70,000 in credit card debt. But as the Court noted in its decision, and as alleged in the Indictment, the defendant and Wieckowski engineered financial transactions involving hundreds of thousands of dollars in connection with the purchase of their home. *See* November 4 Decision at 3-4. And the lifestyle that the defendants have lived for years belies their purported financial struggles now. Simply put, it makes little sense that a couple that could afford a $2 million dollar home, a Porsche, and a Land Rover could not scrape together the money to flee the United States, particularly when motivated by the possibility of decades-long sentences. Indeed, the defendant's submission confirms that fact. For example, one of the credit card statements attached to the defendant's application shows that the couple has an outstanding balance of more than $30,000. But the statement also shows that last month, they paid nearly $7,000 to the balance of the card, and that this month, they had incurred another approximately $7,000 in charges, which includes nearly $2,000 paid to Jellycat and Melissa and Doug, which appear to be toy stores. To the extent that the defendants have the financial wherewithal to make such purchases, that certainly demonstrates that they have the financial ability to flee if necessary.

Moreover, although the Government has not found a large stockpile of cash belonging to the defendants, there are some indications that the defendants have access to sufficient cash to flee if necessary. For example, during the search of the defendants' home, law enforcement agents found approximately $4,000 in cash. Similarly, during a recorded telephone conversation with Female-1, the defendant stated, in substance and in part, that he had more than $3,000 in his car.[6] The fact that the defendant had access to these quantities of cash suggests strongly that he could find the resources necessary to flee.

The fact of the matter is that – as the Court initially found – the defendant has connections to a foreign country, ties to the United States that are not free from question, and the means to flee. The defendant's submission should not call any of those conclusions into question. The Government respectfully submits that the defendant simply cannot overcome the presumption in favor of detention when one considers together the seriousness of the charged offenses, the weight of the evidence, and the nature of the defendant's ties both abroad and to the United States.

*4. The Sixth Amendment Does Not Require That the Defendant Be Bailed*

Finally, the defendant claims that because of his inability to read and write English, he cannot effectively participate in his defense while detained. The Government certainly concedes that restrictions on the defendant's liberty can be burdensome. But taken to its logical conclusion, the defendant's position essentially would mean that any defendant who does not speak English should receive bail, because they all would face the same challenges as those articulated by the defendant. In other words, every defendant who cannot read or write

[6] This conversation was also in Polish. A summary was prepared by a Polish-speaking agent, and provided to defense counsel.

English must rely on counsel or other means to interpret discovery in English. If that fact alone required bail, then none of those defendants could be detained. Such a result would be untenable.

Moreover, it is simply not true that the defendant cannot participate in his defense while detained. For example, even though the defendant may not be able to email based on his inability to write English, there is no doubt – particularly given the undercover recorded conversations in which Jakacki speaks English – that he could call and speak with his counsel whenever he chooses. Therefore, his counsel can explain the discovery, which is in English,[7] to him over the telephone, which is presumably the same thing that would happen if he met with his counsel face-to-face. Furthermore, given the defendant's assertion that he and his wife intend to work together in their defense, the defendant can always discuss the discovery with his wife, who speaks Polish. The defendant is no more hindered in aiding in his defense than the scores of other defendants who cannot read English, and in fact, has many avenues available to him through which he effectively work to further his defense.

**C. <u>Conclusion</u>**

The defendant, with his wife, conspired to illegally distribute hundreds of thousands of tablets of oxycodone and to launder the proceeds from that illegal narcotics trafficking. Under the bail statute, the charges against the defendant create a rebuttable presumption that the defendant should be detained. The nature of the criminal activity alleged, the significant sentence the defendant faces, the weight of the evidence in support of the charges against the defendant, the defendant's connections to Poland, and the defendant's financial means all show that the defendant poses a risk of flight. Accordingly, the Government respectfully submits that the Court should adhere to its initial ruling and deny the defendant's application for bail.

Respectfully submitted,

PREET BHARARA
United States Attorney

By: ______________________________
Sidhardha Kamaraju/Louis Pellegrino
Assistant U. S. Attorneys
(212) 637-6523/2689

Cc: Lindsay Lewis, Esq. (by email)

[7] To the extent the defendant is claiming that he cannot physically review the discovery himself as a result of his detention, it is unclear how he would do that, given that the documents in this case are in English, and, according to the defendant, he does not read English.