FCM5jakH                          bail hearing

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                                15 Cr. 727-2 (JSR)

5   MARCIN JAKACKI,

6              Defendant.

7   ------------------------------x

8
                                              December 22, 2015
9                                             4:    p.m.

10
    Before:
11
                        HON. JED S. RAKOFF,
12
                                              District Judge
13

14                         APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    BY:  SIDHARDHA KAMARAJU
17       Assistant United States Attorney

18  LAW OFFICES OF JOSHUA L. DRATEL, P.C.
         Attorneys for Defendant
19  BY:  LINDSAY ANNE LEWIS
         WHITNEY G. SCHLIMBACH
20

21

22

23

24

25

FCM5jakH                              bail hearing

1          (Case called)

2          MR. KAMARAJU:  Good afternoon, your Honor.  On behalf

3    of the government, Sid Kamaraju and Louis Pellegrino.

4          THE COURT:  Good afternoon.

5          MS. LEWIS:  Good afternoon, your Honor.  Lindsay Lewis

6    of the Law Offices of Joshua Dratel, and with me at counsel

7    table is Whitney Schlimbach on behalf of Marcin Jakacki.

8          THE COURT:  Good afternoon.

9          We are here on a renewed bail application so let me

10   hear first from defense counsel.

11         MS. LEWIS:  Thank you, your Honor.  I think the

12   strength of Mr. Jakacki's bail application, in terms of his

13   ability through that package to secure his presence at all

14   future court appearances speaks for itself, but while I would

15   like to address the merits of that particular package I first

16   just wanted to address the government's response to my papers

17   as obviously I have not put in a submission on that.  But, I

18   will do so in the context of the bail factors under 3142 in and

19   particular the ones that the Court identified in terms of risk

20   of flight.

21         First, in regard to the severity of the offense

22   conduct and penalties associated with these crimes, the

23   government here has identified a specific weight amount that

24   equates to the 500,000 pills that they allege that Mr. Jakacki

25   was involved with, and in identifying that amount they've

FCM5jakH                          bail hearing

1    conducted their analysis under the weight of the drugs.  I

2    would first just start by saying that while I don't object to

3    their analysis that those are the weights that they've

4    identified, I do think that this capitalizes on the guidelines

5    @ten ken is I to apply --

6              THE COURT:  Well, let me put it to you this way and I

7    will see if the government, when we get to them, wants to

8    respond.

9              Surely anyone who has practiced in this court for any

10   time over the last decade or more knows that if there is one

11   judge who finds the guidelines inherently irrational, bordering

12   on the absurd, it is the judge you are talking to right now.

13   So, I don't know that I should pay any attention to the

14   guidelines let alone the competing views of the guideline

15   calculation that you and the government have because if the

16   defendant thought he faced one guideline range and the judge

17   was likely to impose that range, that might be a factor in his

18   flight risk one way or the other depending on what that range

19   was.  But, if the defendant has been informed by his counsel,

20   as I assume he has, that with this darn judge you never know

21   where the hell he is coming out because he pays very little

22   attention to the guidelines, then it becomes a much less

23   relevant factor.  So, now what is relevant is that if convicted

24   under any analysis he faces a significant risk of prison time

25   and not trivial prison time like two days or five days or

1    something like that.  But that's about, I think, as far as one

2    could go in assessing that particular factor.

3              So, I'm happy to hear whatever anyone else wants to

4    say on the guidelines because I forgot to bring a novel to read

5    while you guys had that debate, but I'm perfectly prepared to

6    hear you out and catch up on my sleep.  But maybe you want to

7    move on now to something else.

8              MS. LEWIS:  Yes.  I am aware that I am preaching to

9    the choir on that one.

10             So, moving on to I think the related issue of the

11   weight of the evidence which does speak to whether

12   realistically my client would face, as you say, years under any

13   guidelines analysis.  I do want to refer to the indictment and

14   the discovery we received so far which there is no evidence

15   that my client was involved in any of the alleged conduct prior

16   to September of 2015.  If the government has evidence that

17   shows this, certainly I would like to see it.

18             The undercover calls that they identified, those calls

19   are just from September and October 2015 and they involve about

20   700 milligrams of Oxycodone.  Nor does a blank prescription pad

21   which the government acknowledges -- or identifies was found in

22   Mr. Jakacki's home that he shares with his wife suggests any

23   time frame in which anyone would have been involved in any

24   conduct or in fact that there was any distribution or any

25   illegal conduct there either.  Nor does their reference to the

1    2012 purchase of this home demonstrate illegal conduct prior to

2    2015.  In order to show that there would be some relevance

3    there the government would have to present evidence that

4    Mr. Jakacki knew that the funds deposited in bank accounts that

5    were used to purchase the couple's home were the proceeds of

6    the narcotic trafficking conspiracy and I haven't seen evidence

7    of that either.

8            So, in terms of the weight of the evidence, I think

9    that the range of the conspiracy which starts in 2010 going

10   through 2015 up until about September 2015, I don't think there

11   is any evidence that backs up the government's claims which I

12   think also really limits the range of the conduct that we are

13   even referring to here and assessing the weight of.

14           But, I will move on from that because I think that

15   there are some other issues with regard to the risk of flight.

16           THE COURT:  How old is his son?

17           MS. LEWIS:  He is 11 years old.

18           Mr. Jakacki left Poland when his son was about 1 years

19   old and moved out of the residence when his son was an infant

20   about three or four months old.  He has not seen him once in

21   that period of time.  The government refers in their letter

22   to --

23           THE COURT:  Why not?

24           MS. LEWIS:  Sorry?

25           (Defendant and counsel conferring)

1          THE DEFENDANT:  Your Honor, because I have never been

2     in Poland.

3          THE COURT:  Excuse me?

4          THE DEFENDANT:  I don't -- I never back to Poland for

5     past 10 years, that's why I don't see my son.

6          THE COURT:  So you feel no sense of responsibility to

7     your son?

8          THE DEFENDANT:  Maybe I'm not good father, okay, for

9     my son, in Poland.

10         THE COURT:  Who cares for your son now?

11         THE DEFENDANT:  My ex-wife and my parents, I think.

12         THE COURT:  All right.

13         Go ahead, counsel.

14         MS. LEWIS:  I think the fact that Mr. Jakacki is not

15    even sure who cares for his son is indicative of the lack of

16    relationship there.  Obviously it is unfortunate but it also, I

17    think, whatever relationship they do have I would describe more

18    as a sense of some small obligation rather than disingenuous

19    that result in him ever leaving his family here to go back

20    there.

21         The same is true for his parents.  Mr. Jakacki has

22    expressed to me that he was never close with his parents and

23    that estrangement has only grown and become more fermented in

24    the time he was here.  His maternal grandmother is here, he is

25    close to her, but his real family for the last eight year is

FCM5jakH                              bail hearing

1   his wife --

2              THE COURT:  Does he have siblings?

3              MS. LEWIS:  He has one brother who lives in Brooklyn

4   although they don't have a relationship either.

5              THE COURT:  He seems to me a master at lack of

6   relationships.

7              Go ahead.

8              MS. LEWIS:  I would say to the exception of his

9   relationship to his grandmother who he sees every week and with

10  his wife and wife's family which the relationship with the

11  family is extremely strong.

12             Obviously it has been identified by the government and

13  in papers that he had been having an affair recently.  That's

14  something that Mr. Jakacki and his wife have been working

15  through.  Obviously difficult to do when one of them is

16  incarcerated, but the call that the government actually refers

17  to in their letter, the November 14th call between Mr. Jakacki

18  and this other woman, it actually predated their attempts to

19  really reconcile and to work on their marriage.  Mr. Jakacki's

20  in-laws are all aware of the issues they've had in the marriage

21  which also stems from infertility issues that they've been

22  having.  They've been trying to have a kid which has put a lot

23  of strain on the relationship for the last several years.

24             But, anyway, they all stand behind him very strongly

25  and support him.  In fact, here today in the courtroom is his

FCM5jakH                    bail hearing

1    mother-in-law, his sisters-in-law, two of them, Stella and

2    Elizabeth, both of whom are co-signers, and obviously his wife

3    as well, also his co-defendant Lilian Jakacki is in the second

4    row.  So, they do stand behind him and they are prepared to

5    sign a bond and, more significantly, they are also prepared to

6    post a significant amount of property, enough to collateralize

7    a full bond which includes both the $530,000 that Mr. Jakacki

8    and his wife still have unencumbered in their own home which

9    the rest of that money has gone toward their payment to post

10   bond for Mrs. Jakacki, and they also have an $870,000 mortgage,

11   that's the remaining amount of money there.

12          So, the $530,000 in Mr. Jakacki's home and another

13   $1.5 million to $1.8 million depending which appraisal you look

14   at for his mother-in-law's home, so together that's over $2

15   million in property which would ensure any future appearance

16   here.  And, again, that also includes five co-signers or up to

17   five co-signers if the Court deems necessary, although I would

18   note that originally when bail was set in this case --

19          THE COURT:  You are right, $2 million would even be

20   enough to perhaps purchase a closet in Manhattan.

21          Go ahead.

22          MS. LEWIS:  So, in terms of his bail package, I feel

23   like that is incredibly strong especially when you take into

24   consideration the other things that would be present.  He is

25   amenable, obviously, to electronic monitoring, home detention.

FCM5jakH                              bail hearing

There are a number of things that could further cement his

station here.

          In terms of financial resources that he might have

available to him, I think the government's assessment here is

overblown.  As we described in our papers, all the assets are

either that the couple has either been unduly encumbered or

have been seized by the government; that includes the cash in

the house, the $4,000 of cash in the house and the $3,000 that

the government acknowledges Mr. Jakacki had mentioned was in

his car, although I would want to mention so the Court

understands --

          THE COURT:  So, if I were to release him when you say

home confinement, where would that be?

          MS. LEWIS:  It would be with his wife at their home in

Connecticut which actually would also be beneficial to the

extent that it would allow them to both prepare for their case

and to also mend their marriage.  And that is something that we

have addressed with them, Mrs. Jakacki's counsel Adam

Perlmutter is here as well as Lilian Jakacki herself and

everybody is on board with that and that's what they all very

much want.

          THE COURT:  All right.

          I know you have other points to make.

          MS. LEWIS:  I'm happy not to make them unless the

Court has questions.

FCM5jakH                          bail hearing

1            THE COURT:  Let me hear from the government and we

2    will come back to you in a minute.

3            MR. KAMARAJU:  Thank you, your Honor.

4            I will not belabor the guidelines point given as I

5    know your Honor's views on them, but I think your Honor did

6    settle on the most salient point here which is that regardless

7    of what guidelines analysis is used, the defendant faces a

8    significant criminal sentence as your Honor found about the 60

9    years total of imprisonment obviously based on the statutory

10   maximum.

11           So, he faces a significant amount of time and that's,

12   frankly, regardless of whether, as the defense puts it, his

13   role in the Oxycodone distribution conspiracy is confined to

14   September and October of 2015 given that he is also charged in

15   two separate money laundering counts but with respect to that,

16   the government has obviously laid out a considerable amount of

17   detail in the indictment.  We have produced discovery that show

18   bank records, we have produced records that show the Oxycodone

19   overflow.  Obviously, were the case to proceed to trial some

20   part of our evidence would be witness testimony which is not

21   typically disclosed as regular discovery.  So, I think if we

22   were to proceed to trial there would be witness testimony that

23   defense counsel would contest shows his knowledge.

24           But, regardless, the fact of the matter is that, as

25   your Honor highlighted in the original decision, there are

FCM5jakH                         bail hearing

1    undercover recordings here, there are videotape meetings with

2    Lilian Jakacki, there are recorded telephone conversations with

3    Marcin Jakacki.  And when she specifically asked, the

4    undercover agent, "Are you a DEA agent?  I want to confirm" --

5    excuse me when he was specifically asked for the undercover

6    agent's name to confirm whether she is a DEA agent where he

7    addresses regulations governing Oxycodone distribution and how

8    to avoid them, all of this evidence is laid out in the

9    indictment, and as the Court is well aware as you identified in

10   your decision, the weight of the evidence is one of the factors

11   under 3142.

12          So, however the defense counsel chooses to parse up

13   the charges, the fundamental fact here is that he faces a

14   significant amount of time, there is a substantial amount of

15   evidence against him, and those are two of the factors that

16   weigh in favor of bail particularly when, as in a case like

17   this, you are dealing with a presumption that the defendant has

18   to overcome.

19          And I would like to -- I would like to address -- as

20   the Court is well aware, it is a combination of the factors

21   that are relevant in determining whether the defendant was able

22   to overcome the presumption in this case and so two of the

23   factors already the government would argue weigh in favor of

24   detention whether it is severity of the offenses and the weight

25   in this case.

FCM5jakH                              bail hearing

1              The other factors, specifically the defendant's family

2     ties here, I think the Court highlighted it aptly; he appears

3     to be a master of avoiding relationships except apparently when

4     they serve his interest.  So, he has no relationship with his

5     family in Poland he says but he provides money, through his

6     mother who he claims to be estranged from but who he entrusted,

7     I believe defense counsel's submission said $5,000 or $6,000

8     for the care of his son with no discretion.  Whether that

9     relationship is strained or not it is clear that there is in

10    fact a relationship.

11             The same thing, he claims to speak with his son two or

12    three times a year.  The fact is whatever the quality of his

13    life is in Poland there is a life there for him to go to and

14    that is the relevant factor for your Honor's consideration and

15    it is the factor, frankly, that your Honor already found in the

16    November 4th decision.

17             On the other hand, when it comes to his ties here,

18    again, the defendant is very opportunistic in a phone call with

19    the woman which he was having an affair.  The government -- it

20    is not our intention to highlight painful subjects but merely

21    pointing out in a circumstance in which the defendant was

22    speaking confidentially -- I imagine he thought -- with the

23    woman with whom he was having an affair, he said:  I'm not

24    going home to my wife.  But now, to your Honor, when it comes

25    to a bail application, his point is I would like to move home

FCM5jakH                          bail hearing

1   with my wife.  I will be there, I will live with her, we have

2   reconciled.

3          THE COURT:  Well, what do you make of the fact that

4   his in-laws are so clearly supportive of him both on personal

5   terms and in putative financial terms?  That certainly -- they

6   would have every reason to want to cast him aside given the

7   affair that he had but they seem to feel strong ties to him.

8   That suggests, maybe, that his long-term, if you will,

9   emotional and psychological welfare, lie in this country.

10          MR. KAMARAJU:  Your Honor, I think it speaks to their

11   forgiving nature and that may be true.  And the government has

12   no knowledge to dispute that and I don't doubt that they have,

13   as expressed in their letters, that they have a desire to

14   support him.  But the relevant question is not their nature,

15   the relevant question is the defendant's nature and the

16   defendant, to use your Honor's language again -- I don't mean

17   to parrot it over and over again --

18          THE COURT:  It seems like a good -- feel free to quote

19   me.  I won't mind.

20          MR. KAMARAJU:  Well, I don't want to bastardize

21   everything your Honor says, but --

22          THE COURT:  I think the technical term is "suck up"

23   but, go ahead.

24          MR. KAMARAJU:  We are the government, your Honor.

25   What can we do.

FCM5jakH                          bail hearing

1              He chooses to assert these relationships at the time

2       when they serve him best.  He is a master of none when it seems

3       to suit him when he tries to apparently, as he said, or to

4       paraphrase him, avoid his obligations to his son but when it

5       comes time that he needs to clothe himself in family, he

6       asserts to your Honor that all of his family members are behind

7       him.

8              On the other hand, when speaking just a month ago -- I

9       mean I recognize that defense counsel asserted that this call

10      that the government cited to predated this reconciliation but

11      it couldn't have predated it by much, your Honor.  Defense

12      counsel maybe can answer it but I would suspect it is a matter

13      of weeks at most and in this case what you see is, in that case

14      if that is true, that just weeks before reconciling the

15      defendant said if they let me out, I'm going to put on my

16      bracelet and I'm going to move in with you.  I'm going to leave

17      my wife and tell pretrial I'm home.

18             So, your Honor, I think that undercuts the defendant's

19      view of the strength of his relationships, not his in-laws.

20      Views of the strength of the relationship, the government

21      submits, is frankly irrelevant.

22             So, unless your Honor has additional questions?

23             THE COURT:  One question.

24             @I wasn't sure whether, first whether technically this

25      is a factor the Court should consider and secondly whether,

1    even if I should how much weight to give it, but that your

2    adversary makes the point that they will be infinitely better

3    able to prepare his defense if he is out on bail.  Now, part

4    that have was couched in terms of language aspects although he

5    can read and speak English but most of it is just on the sort

6    of common sense notion that it's infinitely easier to spend a

7    lot of time with your counsel preparing your defense when you

8    are not in jail.

9         MR. KAMARAJU:  Well, as your Honor knows, that's not a

10   factor under the bail reforms, under the bail statute, and if

11   it were a factor under the bail statute then I'm not sure how

12   any defendant, at least on risk of flight, could ever be

13   detained because that is true for every defendant.  For every

14   defendant, as you put it, the common sense notion is that the

15   more liberty or the more freedom they have with which to meet

16   with their counsel, the easier it is to prepare.  But, if that

17   were the case or if that were a factor for the Court to give

18   either consider in the first place or give significant weight

19   to, then it would be a factor in every single detention

20   argument.

21        THE COURT:  Well, no.  I mean I'm not sure that

22   makes -- I will hear your adversary on whether it is a factor

23   at all but the fact that it would be present in every case

24   doesn't mean it would be dispositive in every case, it would

25   just be a factor in every case.  I mean if you take that

FCM5jakH                          bail hearing

1       argument and turn it on its head the defense would argue, well,

2       in the overwhelming majority of federal drug cases the

3       potential penalty is very high and, therefore, we should not

4       worry about that because it's going to mean the detention

5       automatically of every defendant who is charged with a drug

6       offense.  And so, I'm not sure that these arguments about, that

7       cut across the board are necessarily eliminated by the fact

8       that they cut across the board.  It seems to me they're present

9       in every case for a good reason that the Court should weigh in

10      the balance.

11              MR. KAMARAJU:  Well, to the extent the Court would

12      consider the factor and all I appreciate that it wouldn't be

13      dispositive.  I think that if the Court were to weigh it the

14      question would be how -- does it actually prevent the defendant

15      from preparing a defense and in this case you have an instance

16      in which the defendant certainly can communicate with his

17      lawyer, in which the defendant also, based open his own words

18      or the words from family, has the ability to communicate with a

19      co-defendant of his who has received, I believe if not all of

20      the same discovery substantially the same discovery and against

21      whom many of the same charges are levels who speaks both polish

22      and English English and who, if the defendant is taken at his

23      word and co-defense are also taken at their word, are working

24      together to defend against this case.

25              So, whatever weight typically your Honor may give to

FCM5jakH                          bail hearing

1    that factor in, say, a drug case, a courier case, for example,

2    with a non-English speaker who is picked up in this country

3    without any of these factors, in this case that's not the case

4    before your Honor.  Here what you have is you have a defendant

5    who has retained counsel, retained exceptional counsel who has

6    been able to prepare a bail argument for him, who can continue

7    to deal with him with respect to the discovery, who can analyze

8    it, and who can work with his family and co-defendants.

9              I don't think in this case whatever weight it

10   typically may have that it should play a significant role in

11   your Honor's decision.

12             THE COURT:  By the way, have we set a trial date in

13   this case yet in this case.

14             MR. KAMARAJU:  I do not believe we set a trial date.

15   We set a date to come back after motions were filed.

16             THE COURT:  When is that conference on the motions.

17             MR. KAMARAJU:  I believe it is January 16th.  I can

18   confirm it if I can look at my calendar, your Honor, unless

19   that's a Sunday gentleman it is a Saturday.

20             MR. KAMARAJU:  So then I think it is January 15th,

21   your Honor.

22             THE COURT:  Maybe we should set a trial date.

23             MR. KAMARAJU:  The only issue, your Honor, is that the

24   third defendant and counsel is not here.

25             THE COURT:  True.

FCM5jakH                          bail hearing

1          MR. KAMARAJU:  So.

2          THE COURT:  We will wait for the January conference.

3    Okay.

4          Let me hear again from defense counsel.

5          MS. LEWIS:  Thank you.

6          I will just respond first to the discussion that was

7    just raised about the additional factor that may or may not be

8    part of the traditional baying argument here.

9          Obviously I think had we discuss bail it is not

10   unreasonable ever for fairness to come into play so I would say

11   that it should be something to be considered against whether

12   thrrp conditions that would secure the defendant's release

13   which I say are present here, along with that factor to say

14   that if that is the case then certainly something that hinders

15   the fairness of the proceeding would always weigh in favor

16   after lug the defendant's release.  But, I also say that I'm

17   going to assume here -- and correct me if I am wrong -- that

18   Mr. Kamaraju has never been a defense attorney because had he

19   been one he would know how truly difficult it is to communicate

20   with a client who is incarcerated regardless of the quality of

21   counsel or the time counsel has available.  It has taken me a

22   couple of weeks, three maybe, since coming into this case, to

23   put together a bail argument that had I had better access to my

24   client, I would have been able to put it together far faster.

25   It takes longer to analyze the discovery, to go over it with my

FCM5jakH                          bail hearing

1    client, to convey conversations that I had with outsiders to my

2    client to find out if they're accurate or not, to find out who

3    I need to contact on his behalf.  And this doesn't just go to

4    bail but certainly the fact that it has taken as long as it has

5    to put this together is indicative of a bigger problem --

6              THE COURT:  Of course, having been a criminal defense

7    lawyer for 16 years I wouldn't have any idea what you are

8    talking about.  But, go ahead.

9              MS. LEWIS:  If you did, maybe you did, I would also is

10   that you just going to the discovery in this case, we have

11   clearly a dispute here over what role, if any, my client has

12   played in this conduct and my ability to effectively defend him

13   and to establish what I believe to be --

14             THE COURT:  The government says that even on what you

15   have seen already this is a strong case.

16             MS. LEWIS:  I disagree.

17             THE COURT:  The recordings and whatever, what about

18   that.

19             MS. LEWIS:  Those recordings, where he still talking

20   September and October 2015 and I have looked at the bank

21   records, I don't see a connection to my client that establishes

22   money laundering to the extent that he had knowledge of a drug

23   conspiracy.  I mean these are all allegations as far as I'm

24   concerned and I'm prepared to dis prove as many if not all of

25   them but I do believe that I need my client available to me and

FCM5jakH                          bail hearing

1    to be able to meet with co-counsel and to do what we need to do

2    in order to get to a place where we can resolve this case in

3    the most effective and most fair manner possible.

4             THE COURT:  By the wakes is the government maintaining

5    that he is a flight risk, a danger to the community both?  Or

6    what.

7             MR. KAMARAJU:  The the government is arguing primarily

8    on flight risk.

9             THE COURT:  So, the reason I raise that I wonder --

10   the presumption of course operates in both situations, but I

11   wonder whether where there is danger to the community,

12   overcoming the presumption seems to be quite difficult but

13   where it is a flight risk it seems to me it is not such a --

14   that the presumption doesn't operate with the same, quite

15   ultimate force because all that is meant by the presumption in

16   that situation is that these crimes carry heavy penalties,

17   right?  The presumption is part of the war on drugs and its

18   origins and Congress, presumably, saw the continuation of the

19   drug trade on the part of some to be a potential danger to the

20   community but that's night factor that the government is

21   invoking into the case of this particular defendant.  The

22   presumption with respect to flight arose in, if it had a,

23   because even Congress has to have a rationale for any

24   presumption under the constitution -- arose from both the

25   international nature of many narcotics conspiracies but that

FCM5jakH                              bail hearing

1    doesn't seem to have been particularly a factor that the

2    government is relying on in this particular defendant's

3    situation, or a heavy penalties note the heavy penalties that

4    attach to drug offenses which the government of course is

5    relying on but it seems in some ways to be double-counting it

6    to say not only is there a presumption here but there is also a

7    heavy penalty.  If the heavy penalty is the reason for the prum

8    no period before F note.

9            MR. KAMARAJU:  Is your Honor saying it would be double

10   counting to because the presumption is tied to the heavy

11   penalty that you should also consider the heavy penalty a

12   separate factor?  I want to make sure I understand.

13           THE COURT:  What I am saying is in is assessing

14   whether the presumption is overcome and clearly the burden is

15   on the defense to overcome presumption, I think it's not

16   unreasonable to look at what were the factors that led Congress

17   to impose the presumption and see which of those factors

18   operate here, and if certain of the factors don't operate, that

19   doesn't mean the presumption dis appears but it may mean that

20   less is required to overcome it.

21           MR. KAMARAJU:  Well, I mean I think as a matter of

22   common sense, as your Honor articulated certainly in a case

23   that involves violence or danger to the community there is an

24   additional consideration I guess to overcoming the presumption.

25           I any with respect to sort of the sliding scale of

FCM5jakH                         bail hearing

1   sorts that it sounds like your Honor is suggesting, I think

2   it's fair to say that when different factors are in play,

3   obviously the presumption has more force than it does in other

4   cases.  I do think, however, that given that fundamentally what

5   we are talking about is whether a person will flee a potential

6   prison sentence that the fact of a significant penalty is sort

7   of a common sense basis on which to ground the prum hung is all

8   I'm saying, your Honor.

9              THE COURT:  Well, I think that's fair.

10             What percentage of person of defendants in the

11  Southern District of New York who have been released on bail

12  but with home confinement and electronic monitoring have fled?

13             MR. KAMARAJU:  I don't have an exact percentage of

14  that, your Honor.  I'm sure it is not a substantially high

15  percentage and I can try to find out if it would inform your

16  Honor's decision.

17             THE COURT:  Well there are two ways of looking at that

18  because the statistic could be misleading because it could be

19  that bail was denied in the great majority of cases where there

20  might otherwise have been a real meaningful possibility of

21  flight but I am struck by the fact that in the 20 years I have

22  been on the bench only one defendant before me has ever fled

23  and his bail package was on consent.  No one saw it coming,

24  even the government.

25             MR. KAMARAJU:  Well, like I said, your Honor, I can't

FCM5jakH                        bail hearing

1   give you a specific percentage but I know within the last eight

2   months to a year there was a case in the eastern district where

3   a defendant put his electronic monitoring bracelet on a ceiling

4   fan so that the motion was generated, your Honor may have heard

5   about that case and fled that way.

6          I had a case in front of Judge Cote is an extradition

7   days in which a $2 million personal bond was set the defendant

8   need to Dominican Republic where the bond was signed by close

9   members of the defendant.

10          So, while I think your Honor's question about the

11  statistic certainly brings up the fact that most defendants who

12  I believe are on home confinement don't abscond, it does happen

13  and it is not impossible for it to happen.

14          THE COURT:  I'm not surprised something like that

15  happened in the Eastern District.  There is no accounting for

16  what will happen there.

17          MR. KAMARAJU:  That is true.  I'm reluctant to rely on

18  Eastern District precedent, your Honor, but.

19          THE COURT:  Let me go back to your adversary for a in.

20          MS. LEWIS:  I wanted to respond to one point which is

21  to say that while I don't have the precise percentage for the

22  category that you described, the District, in this particular

23  circumstance with home confinement, I do know that what my

24  adversary identifies is the far and away exception and not the

25  rule.  I believe that the number is somewhere for -- and I

FCM5jakH                          bail hearing

1    think this encompasses perhaps both state and federal, about 2

2    percent, perhaps?  I have heard somewhere between 1 and.

3    percent there a defense organization recently that was

4    inquiring about the bail statute

5              THE COURT:  Of course a point out to government

6    counsel the meaningful sense of that statistic you would have

7    to know whether -- what percentage of people are being denied

8    bail.  You would have to know all sorts of things for that

9    statistic.

10             If, for example, judges are routinely denying bail in

11   any close case then, of course, the percentage of people who

12   run is going to be low.  If judges conversely are routinely

13   releasing people in close cases and the personal was still low,

14   then there that would be a much more forceful statistic.

15             So, it would be say very difficult statistic to

16   evaluate without a lot of information.

17             It is troubling to me that not one word has been said

18   by either side -- I am note I am fortunate to notice very able

19   counsel on both sides -- about sort of the most fundamental

20   aspect of the right to bail under the constitution, one that

21   Congress for got about with the full advice and consent of the

22   Supreme Court decades ago which is someone acautioned of a

23   crime is presumed innocent and therefore is entitled to his or

24   her freedom until convicted baring danger to the community,

25   flight risk and all the things you have discussed, presumption

FCM5jakH                        bail hearing

1    and so forth.

2              It is as if the excesses of confinement by the English

3    that led the founding fathers to place the bail provision into

4    the constitution has been ripped from our collective memories

5    and replaced with factors and presumptions and calculations but

6    I'm just getting too old.

7              So, anyway, anything else either counsel wanted to

8    say?

9              MR. KAMARAJU:  Nothing more from the government, other

10   than if it is relevant to the Court's determination, I was a

11   defense lawyer for a very brief period of time, and a poor one

12   at that many.

13             THE COURT:  I have found that prosecutors in the

14   Southern District of New York, even without being defense

15   lawyers, are among the most fair-minded prosecutors in the

16   nation so that's not a requirement but I am grad you were

17   paroled.

18             Anything further from defense counsel?

19             MS. LEWIS:  Just to the extent that I obviously concur

20   with the Court that the right to bail is something that is beck

21   essential and the bail statute has largely turned on its head

22   and obviously the hope the Court's decision today reflects not

23   only the intentions of that right to bail at its inception but

24   also the fact that we do have a package here that the people

25   involved in are eyes open, fully aware of.  These are very

FCM5jakH                       bail hearing

1    intelligent, very thinking, smart people who also have a

2    long-standing relationship with this man who has been close to

3    them for the past eight years and surely --

4            THE COURT:  And I don't mean to pursue this sin

5    include but I wonder a little bit about whether what is of

6    concern to them, ultimately, is the welfare of his wife, their

7    blood relative.

8            MS. LEWIS:  I think --

9            THE COURT:  What they would want to see for her sake

10   is a reconciliation and they may feel that they should do

11   everything in their power because of their love for her to

12   maximize that possibility.  That doesn't necessarily bear on

13   their feelings for him and it even less bears, as the

14   government points out, on his feelings for them.  But, I don't

15   know any of that, I'm just hypothesizing.

16           MS. LEWIS:  I would say from my own conversations I

17   don't think the two points are mutually exclusive.  I think

18   that obviously they do want the best for their sister,

19   daughter, respectively, and luckily for them the fact that they

20   both feel complete faith that Marcin will abide by the

21   conditions of his bond and also that they want him to be

22   returned to his wife so that they can be together during what

23   is certainly a difficult time which in part has led to this

24   reconciliation and reelingzation of what is truly important to

25   both of them, those interests coincide and so I think for that

FCM5jakH                         bail hearing

1    reason as well it should be yet another reason why bail is

2    appropriate in this case.

3              THE COURT:  All right.

4              Well, the unfortunate part of having two splendid

5    counsel in front of me is a can't make up my mind right now so

6    I will make it up by tomorrow and we will issue an opinion

7    since the court house is closed on the 24th I will issue is

8    before 5:00 tomorrow one way or the other but I thank all

9    counsel for their help and this matter is taken sub judice.

10                               o0o

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25