G53AJAKHps

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

          v.                          15-cr-727 (JSR)

LILIAN JAKACKI,
MARCIN JAKACKI,

              Defendants.

------------------------------x

                          New York, N.Y.
                          May 3, 2016
                          5:20 p.m.

Before:

              HON. JED S. RAKOFF

                         District Judge

              APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
BY:  SIDHARDHA KAMARAJU, ESQ.
     LOUIS A. PELLEGRINO, ESQ.
     JORDAN L. ESTES, ESQ.
     Assistant United States Attorneys

ADAM D. PERLMUTTER, ESQ.
     Attorneys for Defendants Lilian Jakacki,
     MW&W Global, and European Apothecary
Perlmutter & McGuinness, P.C.

LINDSAY A. LEWIS, ESQ.
     Attorney for Defendant Marcin Jakacki
Law Offices of Joshua Dratel, P.C.


Also Present:  John Moscato
               U.S. Probation Officer, New York

               Nicole Owens
               U.S. Probation Officer, Connecticut

G53AJAKHps

```
1                    (In open court)
2             THE CLERK:  Case United States v. Jakacki, 15-cr-727.
3     Will counsel please identify yourselves for the record.
4             MR. KAMARAJU:  Good afternoon, your Honor.  Sid
5     Kamaraju and, Louis Pellegrino, and Jordan Estes from the U.S.
6     Attorney's Office.  And with us at counsel table is United
7     States Probation Officer Nicole Owens from the District of
8     Connecticut and United States Probation officer John Moscato
9     from the Southern District of New York.
10            THE COURT:  Good afternoon.
11            MR. PERLMUTTER:  Good afternoon, your Honor.  For
12    Lilian Jakacki, MW&W Global, and European Apothecary, Adam
13    Perlmutter.
14            THE COURT:  Good afternoon.
15            MS. LEWIS:  Good afternoon, your Honor.  Lindsay Lewis
16    for Marcin Jakacki.
17            THE COURT:  Good afternoon.
18            I convened this hearing because of a report that I
19    received from Pretrial Services that stated that Probation
20    Officer Nicole Owens notified the Pretrial Services of
21    increasing arguments between Marcin and Lilian Jakacki, and
22    this led Probation Officer Michael Rafferty, who was covering
23    for Ms. Owens, to be concerned about Lilian Jakacki's safety
24    after Ms.Jakacki made an unscheduled departure from her
25    residence, and then the two of them had a very loud argument on
```

G53AJAKHps

```
1   the telephone with Officer Rafferty, which led in turn to a

2   visit from the Greenwich Police Department.

3            So let me start with the one obvious thing.  I do not

4   expect any person who is having a conversation with an officer

5   of the court to ever engage in agitated, bickering, or

6   uncivilized conversation.  Should either or both defendants

7   ever engage in that conduct again, they will be violating this

8   Court's order, given now, and will be immediately remanded

9   without further ado.  Do you understand that, Mr. Jakacki?

10           DEFENDANT M. JAKACKI:  Yes.

11           THE COURT:  Do you understand that, Ms. Jakacki?

12           DEFENDANT L. JAKACKI:  Yes.

13           THE COURT:  All right.  Now let's find out what

14  actually was going on.

15           So maybe we should hear from Ms. Jakacki first.

16           MR. PERLMUTTER:  Yes.  Good afternoon, your Honor.

17           Your Honor, my understanding of the situation is as

18  follows:  There has obviously been great strain placed on the

19  marriage as a result of the charges.

20           THE COURT:  Now, according to this, Mr. Jakacki has a

21  mistress.  Is that correct?

22           MR. PERLMUTTER:  Yes.  My understanding, Judge, is

23  that that's been sussed out and that is not the case.

24  Ms. Jakacki had her suspicions.  It did lead to conflict within

25  the family.  And they have worked through that.  And that is
```

G53AJAKHps

1    not happening.  And we feel certain of that fact, that

2    Mr. Jakacki is not engaged in any type of extramarital

3    relationship and has ceased contact in fact with the woman who

4    is the subject of that contact, and that that occurred post

5    approximately -- that happened early in April, that that

6    contact completely ceased and they put that issue behind hem.

7            The issue on the 18th that you've referenced, I just

8    want to be clear that from what we've been able to discern,

9    that that issue is not -- that was not a conflict between

10   Mr. and Mrs.Jakacki about their relationship.  What triggered

11   it was just strain within Ms. Jakacki's family about the case

12   overall and difficulty that Ms. Jakacki has been having with

13   her family, not with Mr. Jakacki.  And it's just been very

14   stressful.  And we can't hide from the fact that she did have

15   an unauthorized absence from the home, which is unacceptable.

16   I can't tell you that --

17           THE COURT:  How long was that for?

18           MR. PERLMUTTER:  It was approximately, I think it was

19   a little under an hour.  And I've spoken to Ms. Jakacki about

20   it.  What she said is that she had driven to the North

21   Greenwich Congregational Church parking lot.  It was at night.

22   And she just sat in her car and gathered her wits about her and

23   then returned to the house.

24           That location is about three minutes away from her

25   home.  It's about 1.8 miles from the house.

G53AJAKHps

1      And then she came home.  Officer Rafferty called in.

2 She was still upset, again, not because of the relationship

3 between her and Mr. Jakacki, but because of the overall stress

4 between her and her family.

5      THE COURT:  So what was the argument on the phone with

6 the probation officer about?

7      MR. PERLMUTTER:  I think it was just that she was

8 upset and Mr. Jakacki was trying to calm her down and trying to

9 explain that, you know, it wasn't because of the conflict with

10 the marriage.  And I think that, you know -- let me just take a

11 step back.  This is obviously a difficult situation to monitor

12 for Pretrial Services.  It is a couple.  They are married.

13 They are both defendants in a criminal case.  They are both

14 occupying the same space.  So I understand that pretrial's

15 primary concern, among many of them, is to ensure that there is

16 no concern with domestic strife in the home, that something

17 could happen with that.  And we get that.  We understand why

18 Officer Rafferty may have interpreted things the way that he

19 did, why he called the Greenwich Police Department to make a

20 wellness check.  When the Greenwich police did come, they were

21 asleep together in bed.  They woke up.  They spoke to the

22 Greenwich police.  The Greenwich police, my understanding is

23 that they were extraordinarily professional about the wellness

24 visit.  They spent a little over an hour speaking with them to

25 make sure everything was OK, and then departed.

G53AJAKHps

1          But I just want to be clear that we have spoken to our

2    clients at length about this issue.  We've been in continual

3    communication with them ever since the memo got filed, not just

4    about scheduling but about the substance of what happened, and

5    have explained to them that pretrial is not a babysitting

6    service.  It is, you know, they are to be compliant with all

7    their conditions.  They are to be civil with each other.  And

8    frankly, at this point, they're the only thing that they have,

9    is each other, and they really need to embrace that and to live

10   in peace with each other.

11          I will just point out, you know, we have the memo

12   filed on April 19.  There hasn't been any incident since that

13   time, not that that should somehow excuse what happened back on

14   the 18th, but there does seem to be peace reigning in the home,

15   and I think that that's going to continue.

16          THE COURT:  All right.  Let me hear from Mr. Jakacki.

17          MS. LEWIS:  Your Honor, I think Mr. Perlmutter summed

18   up pretty much what we would say here.  I did speak with P.O.

19   Rafferty on the phone earlier today -- I realized he was sort

20   of the one critical person here we have not spoken with -- just

21   to make sure there was nothing I didn't know about the

22   incident.  And I did specifically ask him if it was a fight

23   between them that had in any way precipitated this.  And he

24   said that, no, it was the unauthorized absence from the home,

25   and that he did not specifically ask on the phone whether there

G53AJAKHps

1    was any issue between them when he called, but just based on

2    the past circumstance that had been in the file from Nicole

3    Owens, he knew that there had been some contention in the

4    marriage, and he did confirm that he sent the wellness to check

5    out, in part because of that and obviously because there was

6    some argument on the phone, but that, again, his understanding

7    was that the wellness check had concluded that it was fine and

8    that there was no danger to either of them at the time that he

9    arrived, and left.

10           THE COURT:  Well, I hear what counsel is saying, but

11   I'm also observing Ms. Jakacki in tears.  So I wonder whether

12   I'm getting the whole story.  But let me hear from probation,

13   from Pretrial Services if they have anything to add.

14           MS. OWENS:  Good afternoon, your Honor.  Nicole Owens

15   from the District of Connecticut.  Probation had had a concern

16   for quite some time, and we have reported our concerns to the

17   Southern District pretrial service office.

18           A while back, Ms. Jakacki reached out to me one

19   evening on her way home; we had a telephone call, maybe about

20   9:30 at night, concerning that Mr. Jakacki had been unfaithful

21   and that the possibility of him living together was up in the

22   air.  The next day she called.  Everything was fine.  I met

23   with him a couple days after.  He said that everything was

24   fine.  And then in between there were text messages to me that

25   he was still unfaithful and that he needed to find a different

G53AJAKHps

 1    residence, so I asked if they wanted counseling.  And at that

 2    point both said they would get back to me.

 3          Ms. Jakacki actually wrote, sent an e-mail, maybe a

 4    couple days before this incident, asking for the counseling.

 5    And actually right after that, I got an e-mail from her stating

 6    that she had placed a GPS tracker under Mr. Jakacki's car, and

 7    that he had gone to his mistress's house, and she confirmed

 8    with the GPS tracker.  And also in the e-mail she indicated

 9    that she could not live like this anymore and that there was

10    potential for harm caused to herself.

11          So at that point I reached out to the Southern

12    District of New York, asking that we have a hearing so that the

13    Court can address these issues.  And a few days after that I

14    met with her, and she said that everything was fine.  And then

15    while I was on family leave, your Honor, the incident that

16    we're here about today arose with Officer Rafferty.

17          Now, I did speak to Officer Rafferty, and he advised

18    me that there were -- it looks to me from my notes, your Honor,

19    from our location monitoring company, that there was a "did not

20    enter," which means that Mr. Jakacki did not enter her home

21    when she was supposed to be in her home -- which would have

22    prompted an alert, and Mr. Rafferty, who was covering, was

23    responding.  He tried to call the home cell number, did not

24    receive a response.  And finally he was able to speak to

25    Mr. Jakacki, who noted that Ms. Jakacki left the home because

G53AJAKHps

1   she was upset.  He didn't elaborate on what she was upset

2   about, but that she was upset.

3           When Mr. Jakacki returned to the home, which, my notes

4   state that she returned at 22:38, we have a "did not enter" at

5   21:30, but she did enter at 22:38.  The monitoring company does

6   send us another response that the person has entered the home,

7   at which time Mr. Rafferty did make a phone call, was able to

8   speak to Ms. Jakacki, and she said that she was upset, and he

9   heard a voice in the back yelling in the Polish language.  He

10   did not understand what that individual was saying, but knew

11   from experience that the situation was not a good situation.

12   But he asked Ms. Jakacki if she was OK.  She said yes.  But he

13   still thought it would be a good idea to reach out to the

14   Greenwich Police Department for a well check.

15           Thank you.

16           THE COURT:  So Ms. Jakacki, do you want your husband

17   living with you, or would you rather have him be relocated to

18   another location?

19           DEFENDANT L. JAKACKI:  Like my attorney stated, he's

20   the only thing I have right now.  So the answer is yes.

21           THE COURT:  That's not much of an answer.

22           DEFENDANT L. JAKACKI:  I mean, I love him.  And we're

23   working through our issues.

24           THE COURT:  Counsel.

25           MR. KAMARAJU:  I'm sorry to interrupt.  There was one

G53AJAKHps

1   thing, I believe, one e-mail that I believe Officer Owens just

2   wanted to refer to, just to give the Court a little more

3   context.

4            THE COURT:  Yes.

5            MR. KAMARAJU:  I'll let her address it.

6            THE COURT:  Yes.

7            MS. OWENS:  Thank you, your Honor.  On April 10, I

8   received an e-mail from Ms. Jakacki entitled "I Cannot Live a

9   Twisted Life," and she states, "I installed the GPS in his car.

10  He promised it was over, and last night he told me to suck it

11  up with his cheating behavior.  He said he would shoot" -- and

12  it says "he," I'm guessing she means me -- if I would put him

13  back in MCC.  I cannot be in the same house with this person.

14  I talked with Camilla's mother the other day, and she confirmed

15  my suspicions that this was going on for close to three years.

16  Please do a hearing or something.  Lilian."

17           THE COURT:  So let me ask a different question, which

18  is, is there any reason why Mr. Jakacki could not relocate to

19  another location, like a hotel or friend's house or something

20  like that?

21           MS. LEWIS:  Your Honor, we did address whether there

22  was another residence that one of them could reside in,

23  Mr. Jakacki or, frankly, I think, either of them, in terms of a

24  hotel.  I don't know that they have the financial means to

25  afford that at this point.  And in terms of another family

G53AJAKHps

1     member or friend, I can't really say at this time.

2               I think, when we say that they really do have each

3     other, I think this case has been divisive in their lives and

4     that they really are each other's main support system.  There

5     is some contending, I think, with their family.  And as you

6     know from our previous bail hearing with Mr. Jakacki, his

7     family is not here.  It's really her family.  And there is some

8     strain there.

9               I would also have it that she was then -- we did

10    discuss this with them.  They are both committed to being

11    together in the same home.  They said that, around two weeks

12    ago, they had spoken together and had decided that they were

13    really committed to be with each other and to making this work.

14    Obviously we're very attuned to this and are continuing to

15    monitor it on our own.  And if, obviously, there comes a point

16    where we feel that it would be in their best interests to live

17    in separate residence, we will approach the Court with that and

18    ask for a bail modification.  But at this time I do think it

19    would be in their best interests to try to see if we can make

20    this work.

21              MR. PERLMUTTER:  Judge, I would just add that my

22    understanding is, after that e-mail was sent earlier in April,

23    I think April 10, that Ms. Jakacki was called and asked if she

24    felt if -- whether she was in any danger.  Her response was no.

25    But she did respond that she would be interested in counseling

```
 1    services for both of them, if it is possible.  They remain open
 2    to that.
 3              THE COURT:  Well, let me ask Pretrial Services, is
 4    that an option?
 5              MS. OWENS:  Yes, your Honor.  Counseling, yes.
 6              THE COURT:  Do you need a court order for that?
 7              MS. OWENS:  We do, your Honor.
 8              THE COURT:  Is there any objection?
 9              MR. PERLMUTTER:  No, Judge.
10              MS. LEWIS:  No, your Honor.
11              THE COURT:  So ordered.  And you can provide me with
12    any paperwork that you need in that regard and I'll sign it.
13              MS. OWENS:  Thank you.
14              THE COURT:  Well, given all the representations, I'm
15    inclined to leave things as they are, other than I think
16    counseling sounds like a good idea.  I'm not totally convinced
17    that something couldn't be worked out for a separate residence
18    if it came to that, but I will leave that for a future date if
19    necessary.  So for now, we'll leave things.
20              I am very glad Pretrial Services brought this to my
21    attention, and I will ask them to continue to apprise me of
22    what's going on and, any indications of problems, to let me
23    know.  And I'm glad to hear defense counsel are monitoring the
24    situation as well.  So, as officers of the court, you should
25    also bring to my attention anything that might constitute a
```

G53AJAKHps

```
 1    threat of violence or anything of that sort.
 2              All right.  Anything from the government?
 3              MR. KAMARAJU:  No, your Honor.  Obviously, as the
 4    Court is aware, we are recommending detention, and this doesn't
 5    change our view, but we understand the Court --
 6              THE COURT:  None of this seems to me to warrant, on
 7    the current record, detention.  Detention would be based on, if
 8    there were of course a more serious threat of violence, that
 9    would warrant detention.  But I haven't heard that from
10    anything I've heard this afternoon.
11              MR. KAMARAJU:  We understand, your Honor.  We just
12    wanted to note it for the record.
13              THE COURT:  Very good.  Thanks very much.
14              MR. KAMARAJU:  Thank you, your Honor.
15                              o0o
16
17
18
19
20
21
22
23
24
25
```